The **UNIVERSE LIFE INSURANCE COMPANY, AIA Service Corporation, and AIA Insurance, Inc., Appellants,**

v.

**Ida M. GILES, Appellee.**

**No. 06-93-00110-CV.**

Court of Appeals of Texas, Texarkana.

Argued May 24, 1994.

Decided June 23, 1994.

Rehearing Denied Aug. 16, 1994.

---

**46**

Robert H. Renneker, Dallas, for appellants.

Jesse L. Nickerson, III, Paris, John R. Mercy, Atchley, Russell, Waldrop, Hlavinka, Texarkana, for appellee.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

## OPINION

BLEIL, Justice.

The Universe Life Insurance Company, AIA Service Corporation, and AIA Insurance, Inc. appeal from a judgment awarding damages to Ida Giles, who was a health insurance policyholder. Appellants, hereafter referred to as the company, contend that the trial court erred by entering judgment because the evidence was factually and legally insufficient to support the jury's finding that it had breached its duty of good faith and fair dealing and acted with malice, gross negligence, or conscious indifference, or to support the finding that Giles was entitled to $75,000.00 for mental anguish. The company further argues that certain jury instructions were improperly made, that all claims were preempted by ERISA, that exemplary damages of $500,000.00 are excessive as a matter of law, that notice was not adequately provided, and that the evidence shows that Giles had accepted a settlement offer by the company. We resolve most issues in favor of Giles, but modify the judgment because the exemplary damages are excessive as a matter of law. As modified, we affirm.

This case involves the purchase of health insurance by Ida Giles from the company, her hospitalization for cardiac problems and a bypass operation several months later, and the company's refusal to pay because her heart problems were a preexisting condition.

The following is a timetable of relevant activities:

June 1, 1991 Effective date of policy issued by AIA

August 20, 1991 Giles undergoes double bypass surgery

November 3, 1991 Claim for benefits covering surgery and hospitalization in an amount of about $38,000.00 (total medical expenses eventually totaled about $50,000.00) denied due to a preexisting condition

November 27, 1991 Giles' primary physician informs the company that his records, by mistake, indicated a two- or three-year history of recurrent chest pain and hypertension; in actuality she had a two- or three-week history of chest pain and no hypertension [1]

December 5, 1991 Claim reopened and review

December 12, 1991 Reply to physician setting forth basis for denial of claim based upon records of B.C. Muthappa, M.D., and Blackmon's Pharmacy

December 18, 1991 Muthappa reports to company that he had treated Giles since September 1990 and that before the problems leading to surgery he had never treated her for a heart problem or hypertension [2]

December 26, 1992 After review of Muthappa's letter and the claim, company still denied the claim

---

1. The text of the November 27, 1991, letter provides:

 TO WHOM IT MAY CONCERN:
 I have had the privilege of participating in the care of Ms. Giles from October 16–28, 1991. At the time, she presented with new onset unstable angina pectoris. In reviewing my *History & Physical*, I note that I stated Ms. Giles had a 2 or 3 year history of recurrent chest pain and hypertension, recently much worse. This was a mis-dictation on my part in the original *History and Physical*, as she really had a 2 or 3 *week* history of recurrent chest pain and no hypertension. Unfortunately, when I mis-wrote this statement, it was then picked up in other physicians' dictations and included in my *Discharge Summary*, obviously creating confusion. Again, the statement "2 or 3 year history of recurrent chest pain" is an error on my part; the correct statement is "2 or 3 week history of recurrent chest pain." I hope this information proves of assistance. Sincerely,
 s/ C. Fagg Sanford, M.D.
 C. FAGG SANFORD, M.D.

2. The December 18 letter to the company provides:

 I have treated the patient since 9-4-90 and the following medications were given for the patient.... Mevacor was given for hypercholesteremia, Premarin for hormone substitute and Nalfon was given for her arthritis. Patient has never been treated for heart problem by me or hypertension in the past.
 Sincerely Yours,
 s/ B.C. Muthappa, M.D.
 B.C. Muthappa, M.D.

Ultimately the company denied Giles' claim for two stated reasons. First, she was on a drug called Mevacor, a drug used to decrease cholesterol levels in the blood. The company equated the prescription for this drug with treatment for heart disease, notwithstanding the prescribing physician's affirmation that the medication was not for heart disease. Second, the medical records of C. Fagg Sanford, M.D., reflected that Giles had experienced recurrent chest pain and hypertension for two to three years. However, when Sanford became aware that this misstatement was being used by the company to deny Giles' claim, he informed the company that the onset of her chest pain was two or three weeks.

After multiple efforts to change the company's mind, Giles retained an attorney, who sent a demand letter to the company on June 25, 1992. The company sent a letter to Giles in late July stating that they would reverse their decision. Partial payment was made to the providers on July 28, 1992. Suit was filed on November 13, 1992.

The company contends that the trial court erred in holding that it breached its duty of good faith and fair dealing and in awarding punitive damages because the evidence is factually and legally insufficient to support a finding that it had breached the duty of good faith and fair dealing or that it had acted with malice, gross negligence, or conscious indifference to Giles' rights.

*Legal and Factual Sufficiency of the Evidence*

In reviewing a no evidence point, we consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *Havner v. E–Z Mart Stores, Inc.,* 825 S.W.2d 456, 458 (Tex.1992). If there is any evidence of probative force to support the finding, we overrule the point and uphold the finding. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951). In reviewing a factual insufficiency point, we consider and weigh all of the evidence and set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

We may vacate a damage award or suggest a remittitur only if the award is so factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pope v. Moore,* 711 S.W.2d 622, 624 (Tex.1986); *see Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660. We must carefully scrutinize punitive damages awards to ensure that they are supported by the evidence. When reviewing a challenge to the sufficiency of the evidence to support a punitive damages award, we should detail the evidence in an opinion and explain why the jury's finding is factually insufficient or is so against the great weight and preponderance of the evidence as to be manifestly unjust; a similar type of review is appropriate when we *affirm* such an award over a challenge that it is based on insufficient evidence or is against the great weight and preponderance of the evidence. *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 19–20 (Tex.1994). When conducting a factual sufficiency review of a punitive damages award, we must detail the relevant evidence in our opinion, explaining why that evidence either supports or does not support the punitive damages award in light of certain factors. *Id.* Those factors include: (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice and propriety. *Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex. 1981).

*Good Faith and Fair Dealing*

The trial court asked the jury whether the company failed to comply with its duty of good faith and fair dealing to Giles. The jury found that it did. The issue in a bad faith claim focuses not on whether the claim was valid but on the reasonableness of the insurer's conduct in rejecting the claim. A mere disagreement among experts about whether the cause of the loss is one covered by the policy will not support a judgment for bad faith. To recover, an insured claiming bad faith must prove that the insurer had no

reasonable basis for denying or delaying payment of the claim and that it knew or should have known that fact. *Aranda v. Insurance Co. of North Am.*, 748 S.W.2d 210, 213 (Tex. 1988); *Arnold v. National County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.1987).

The jury found a failure to comply with the duty of good faith and fair dealing. The trial court instructed the jury that a party fails to comply with its duty of good faith and fair dealing when, without a reasonable basis, it denies a claim or delays payment of a claim. The court further instructed the jury that the company had a duty to conduct a reasonable investigation, that it might be liable for damages for an unreasonable delay in payment, and that its reasonableness must be measured at the time it was confronted with the factual situation.

■ There is testimony that Giles was denied coverage because the company believed the claim was based upon a preexisting condition. Giles has effectively admitted that the company did not act in bad faith until one of her treating physicians corrected records showing that she had been treated for heart disease and extreme chest pains for a period of two to three years before the bypass surgery to read two to three weeks before the surgery. The company told Sanford on several occasions that his letter was a reason for denial of coverage, but then wrote him a letter after he corrected his statement saying that it was not the basis for the denial of Giles' claim. Nevertheless, the company thereafter continued to deny the claim based upon Sanford's records and even sued Sanford, claiming that he was the cause of the claim being denied.[3]

The company also claimed that Giles' regular physician, B.C. Muthappa, M.D., had been treating her for a heart problem. This claim was categorically denied by Muthappa on December 18, 1991. Muthappa had prescribed the use of Mevacor to reduce Giles' cholesterol level. Even though Muthappa said Giles had not previously been treated for a heart condition, the company argued that

the medication he prescribed is equivalent to treating heart disease. Under this analysis, any time a person undertook measures designed to prevent the possible onset of a disease or injury, that person might be said to have been treated for the eventual illness or injury. In addition, the testimony also shows that for a substantial amount of time the company refused to tell Giles why it denied her claim.[4] The jury had the right to conclude that the company's actions were not reasonable.

There is also no proof of any further investigation by the company beyond its original request for medical records, despite inconsistencies in the records provided. The company reached a decision that became unreasonable as a direct result of information provided by Giles' physicians. Nevertheless, the company continued to deny coverage after each reason was eliminated. This failure was pointed out to the jury in considerable detail, in conjunction with testimony about the number of cases that are denied for preexisting conditions and the low percentage of insureds who attempt to obtain a change in classification once coverage is denied.

Giles testified about her efforts to communicate with the company that were uniformly rebuffed or ignored, and the effort she expended in communicating with the local doctors, hospital, and insurance agent in order to provide the insurance company with additional information. There is some evidence, which we find sufficient, to support the jury's finding on this question.

The company next contends that there is no evidence or insufficient evidence to support the jury's finding that the company's conduct was the result of conscious indifference to the rights and welfare of Giles. Giles cooperated with the insurance company in every regard, even to the extent of conducting much of the investigatory work. Nevertheless, even in the face of an interrogatory answer admitting that there was not a preexisting heart condition, the insurance company continued to claim through trial that Giles'

---

3. The suit was later dismissed.

4. On the third day of trial, one of the company's representatives testified that he would never have revealed to the patient the information obtained from the doctor that caused them to conclude that she had a preexisting condition.

claim was not covered. It would appear from the evidence that the company refused to act until Giles' attorney sent a demand letter. At that point, the company began to work on the claim and decided to begin payment of some of the claims. The evidence provides some evidence and sufficient evidence to support the jury's finding of conscious indifference.

*Actual Damages*

■ The company next contends that the evidence is factually and legally insufficient to support the jury's finding that Giles was entitled to recover $75,000.00 for mental anguish. Mental anguish was not defined for the jury. In reviewing the jury's award, we recognize that mental anguish is a question uniquely in the purview of the jury and that such awards are made largely in its discretion. *Exxon Corp. v. Roberts*, 724 S.W.2d 863 (Tex.App.—Texarkana 1986, writ ref'd n.r.e.). Because such damages are unliquidated and thus incapable of measurement by a certain standard, the jury has broad discretion in fixing the amount of its award. *Baylor Medical Plaza Servs. v. Kidd*, 834 S.W.2d 69, 78 (Tex.App.—Texarkana 1992, writ denied); *Kansas City S. Ry. Co. v. Catanese*, 778 S.W.2d 114, 119 (Tex.App.—Texarkana 1989, writ denied).

■ The evidence consists in large part of Giles' own testimony about her condition, with some support from other witnesses who had either observed her conduct or who had spoken with her during the relevant time period. Giles testified that she was frustrated because the company was refusing to either talk to her or pay her claims, or even tell her why they refused to pay her claims, that she was under a lot of pressure after the surgery, when her doctors had told her to avoid any kind of stress, that she hated for the telephone to ring or to pick up the mail because she was regularly getting bills threatening to turn her over to collection agencies, and that she was frightened because she knew she did not have the $50,000.00 to pay the medical bills.

Giles also testified that she was extremely embarrassed because of threats by the medical providers to turn her over to a collection agency if she failed to pay the bills. She also testified regarding her depression and the difficulty caused in caring for her mother, who was recovering from surgery at the time that Giles was hospitalized. The insurance company's local agent testified that Giles was highly upset over the medical bills.

In summary, the evidence shows her frustration, anger, and fear of devastating financial obligations, and her reaction to multiple threats to turn her accounts over to collection agencies. In addition, the jury was entitled to recognize the stress created when an individual is denied coverage for which she has paid. We find that there is sufficient evidence to support the jury's award of $75,000.00 for mental anguish.

*Federal Preemption*

■ The company next contends that this case should have been preempted by federal law under ERISA, the Employee Retirement Income Security Act of 1974, 29 U.S.C.A. §§ 1001–1461 (West 1985 & Supp.1994). ERISA applies to any employee benefit plan established or maintained by an employer or an employee organization engaged in commerce or in any industry or activity affecting commerce. The bare purchase of insurance, when the purchasing employer neither directly nor indirectly owns, controls, administers, or assumes responsibility for the policy or its benefits, is not covered by ERISA. *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132 (Tex.1994); *Memorial Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 240 (5th Cir.1990).

The analysis is assisted by regulations issued by the Secretary of Labor that are designed to clarify the statute's definition of "employee welfare benefit plans." Such a plan does not include an

insurance program offered by an insurer to employees or members of an employee organization, under which

(1) No contributions are made by an employer or employee organization;

(2) Participation [in] the program is completely voluntary for employees or members;

(3) The sole functions of the employer or employee organization with respect to

the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

(4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3–1(j) (1987).

The "and" connector indicates that the existence of any one of the four criteria listed in the regulation would prevent a group insurance plan, otherwise qualifying as an ERISA plan, from being excluded from coverage under the Act.

*Memorial Hosp.*, 904 F.2d at 241 n. 6. Thus, the exclusion of a plan from ERISA protections would occur only if all four of these factors were shown to exist. Otherwise, ERISA would preempt a state law cause of action brought by an ERISA plan participant or beneficiary alleging improper processing of a claim for plan benefits. *Pilot Life Ins Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Ramirez v. Inter-Continental Hotels*, 890 F.2d 760, 762 (5th Cir.1989).

 No contributions were made by the employer or by an employee organization toward purchasing Giles' insurance policy. The funds were deducted directly from her personal bank account, thus no payroll de-

duction or dues checkoffs were involved. Participation in the program was completely voluntary, and the employer was in no way responsible for administering, controlling, or assuming responsibility for either the policy or its benefits. The evidence does not support a finding that these factors apply to the present case. Thus, the trial court correctly determined that ERISA did not apply.

*Excessive Exemplary Damages*

 The company contends that the exemplary damages awarded are excessive in violation of Texas Civil Practice & Remedies Code Section 41.007. That section provides that exemplary damages awarded against a defendant may not exceed four times the amount of actual damages or $200,000.00, whichever is greater. TEX.CIV.PRAC. & REM. CODE ANN. § 41.007 (Vernon Supp.1994). Section 41.002(a) states that the chapter applies to an action in which a claimant seeks exemplary damages relating to a cause of action as defined by Section 33.001. TEX.CIV. PRAC. & REM.CODE ANN. § 33.001.[5]

Giles contends that Section 41.007 does not apply because the jury found that the company committed an intentional tort or because this type of action is outside the bounds of the statutory restriction. The question submitted to the jury was one of gross negligence. The jury found that the company acted with conscious indifference to the rights and welfare of Giles. The jury's award is based upon its findings that the company breached its duty of good faith and fair dealing and that it was grossly negligent in doing so.

---

5. Section 33.001 provides that:

(a) In an action to recover damages for negligence resulting in personal injury, property damage, or death or an action for products liability grounded in negligence, a claimant may recover damages only if his percentage of responsibility is less than or equal to 50 percent.

(b) In an action to recover damages for personal injury, property damage, or death in which at least one defendant is found liable on a basis of strict tort liability, strict products liability, or breach of warranty under Chapter 2, Business & Commerce Code, a claimant may recover damages only if his percentage of responsibility is less than 60 percent.

(c) In an action in which a claimant seeks damages for harm other than personal injury, property damage, or death, arising out of any action grounded in negligence, including but not limited to negligence relating to any professional services rendered by an architect, attorney, certified public accountant, real estate broker or agent, or engineer licensed by this state, a claimant may recover damages only if his percentage of responsibility is less than or equal to 50 percent.

TEX.CIV.PRAC. & REM.CODE ANN. § 33.001 (Vernon Supp.1994).

We now consider whether a breach of the duty of good faith and fair dealing constitutes negligence. A cause of action for the breach of the duty of good faith and fair dealing is established when it is proven that there was no reasonable basis for denial of the claim.[6] Since the breach of the duty of good faith and fair dealing is a tort closely akin to negligence, and gross negligence is present here, we believe that under the circumstances the breach of the duty of good faith and fair dealing is a negligent act. Therefore, we conclude that the exemplary damages must be limited to four times the amount of actual damages, or to $300,000.00.

■ Although the company does not specifically attack the sufficiency of the evidence to support the punitive damages award, we address that question out of an abundance of caution. We have already generally detailed the evidence supporting the jury's findings. Considering the *Kraus* factors as required by *Moriel,* we conclude that the evidence shows that: (1) the wrong was clear and continuing, not just a mistake or one negligent act; (2) the conduct of the company was mostly directed toward justifying its initial errors rather than toward justly resolving the claim; (3) the culpability of the company was in being negligent, grossly negligent, and indifferent toward Giles; (4) the company was wholly insensitive to its insured's rights and feelings; and (5) the company's conduct here clearly offends a public sense of justice and propriety. The amount of the exemplary damages awarded is amply supported by the evidence.

### The "Settlement Agreement"

■ The company also contends that the evidence is factually and legally insufficient to support the jury's failure to find that it had settled the claim before trial and further contends that Giles is estopped as a matter of law from denying that a settlement exists because of the payments made before the suit was commenced. A settlement

---

6. Although recovery based upon a breach of the duty of good faith and fair dealing has been discussed in several supreme court cases in some detail, the supreme court has never used the term negligence in relation to this type of action, nor has it applied traditional negligence analyses

agreement is analyzed by the same principles involved in contract analysis. *Stewart v. Mathes,* 528 S.W.2d 116 (Tex.Civ.App.—Beaumont 1975, no writ). An acceptance must not change the terms of an offer; if it does, the offer is rejected. *Gilbert v. Pettiette,* 838 S.W.2d 890, 893 (Tex.App.—Houston [1st Dist.] 1992, no writ). An acceptance must be identical with the offer in order to make a binding contract. *Id.* at 893; *Droemer v. Transit Mix Concrete of Gonzales, Inc.,* 457 S.W.2d 332, 335 (Tex.Civ.App.—Corpus Christi 1970, no writ). It is undisputed that the company never tendered the full amount demanded. The demand was for slightly over $50,000.00. Payment was actually made to the providers of approximately $48,000.00. Partial tender does not constitute an acceptance of the terms offered. *See Mathis v. Bill De La Garza & Assocs.,* 778 S.W.2d 105, 107 (Tex.App.—Texarkana 1989, no writ).

■ The accord and satisfaction necessary to create a binding contract between parties can occur when parties make an agreement to discharge a disputed obligation by a lesser payment tendered and accepted. *Jenkins v. Henry C. Beck Co.,* 449 S.W.2d 454, 455 (Tex.1969). However, there must also be a meeting of the minds and an unmistakable communication to the creditor that tender of the lesser amount is on the condition that its acceptance will constitute satisfaction of the entire obligation. *Id.* at 455; *Mathis,* 778 S.W.2d at 107. None appears in the evidence.

### Jury Instructions

■ The company next contends that the trial court erroneously submitted two instructions to the jury in connection with the question on settlement, informing the jury of the settlement requirements under the Texas Insurance Code and the Deceptive Trade Practices–Consumer Protection Act. The statutes require acceptance of an offer of settlement to be made within thirty or sixty

---

to the cases. *See Viles v. Security Nat'l Ins. Co.,* 788 S.W.2d 566 (Tex.1990); *Aranda v. Insurance Co. of North Am.,* 748 S.W.2d 210, 213 (Tex. 1988); *Arnold v. National County Mut. Fire Ins. Co.,* 725 S.W.2d 165 (Tex.1987).

days, respectively, of the offer of settlement and further require the acceptance to include an agreement to reimburse the claimants for reasonable attorney's fees. The company argues that since this cause involved only common-law contractual issues, it was improper to include language describing statutory settlement obligations.

An instruction is proper if it finds support in any evidence of probative value and might be of some assistance to the jury in answering the questions submitted. *Louisiana & Arkansas Ry. Co. v. Blakely*, 773 S.W.2d 595, 598 (Tex.App.—Texarkana 1989, writ denied). We review a trial court's decision to submit a particular instruction under an abuse of discretion standard. The trial court is therefore given wide latitude to determine the propriety of explanatory instructions and definitions. *Mobil Chem. Co. v. Bell*, 517 S.W.2d 245, 256 (Tex.1974). No abuse of discretion has been shown.

The judgment of the trial court is modified only to the extent that the recovery of exemplary damages is reduced from $500,000.00 to $300,000.00; as modified, the trial court's judgment is affirmed.