DICO, INC., Appellant,

v.

EMPLOYERS INSURANCE OF WAUSAU, Appellee.

No. 96–1824.

Supreme Court of Iowa.

July 1, 1998.

Rehearing Denied Aug. 11, 1998.

Randall G. Horstmann of the Nyemaster Law Firm, Des Moines, and Richard M. Hagstrom and Keith A. Dotseth of Zelle & Larson, L.L.P., Minneapolis, Minnesota, for appellee.

Considered by HARRIS, P.J., and CARTER, NEUMAN, SNELL, and ANDREASEN, JJ.

NEUMAN, Justice.

Dico, Inc., an industrial manufacturer in Des Moines, is saddled with cleanup costs imposed by the Environmental Protection Agency (EPA) under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA).[1] To compel indemnity coverage and the duty to defend under policies with its various insurers, Dico brought suit for breach of contract and declaratory relief. This appeal concerns claims against Employers Insurance of Wausau (Wausau).[2] Dico alleged that under comprehensive general liability (CGL) policies issued by Wausau, coverage is owed on property damage for which Dico is responsible due to the CERCLA action. Wausau urged in a motion for summary judgment that Dico's late notice of the indemnity claim precluded, as a matter of law, Wausau's obligation under the policies. The district court granted summary judgment for Wausau. Because we do not believe the reasonableness of Dico's notice can be determined under this record as a matter of law, we reverse and remand for further proceedings.

## I. Background.

Dico's plant is located in Des Moines across the Raccoon River from the Des Moines Water Works. As early as 1974, trichloroethylene (TCE)[3] was detected in the finished water at the municipal water treatment plant. In 1976, the EPA confirmed the contamination during the National Organic

Mark McCormick of Belin Lamson McCormick Zumbach Flynn, A Professional Corporation, Des Moines, and Jon R. Muth of Miller, Johnson, Snell & Cummiskey, P.L.C., Grand Rapids, Michigan, for appellant.

1. *See* CERCLA, 42 U.S.C. §§ 9601–9675, *as amended by* Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99–499, 100 Stat. 1613.

2. The other defendant insurers have been dismissed from the case.

3. According to an EPA order included in the record, "TCE is an anesthetic which depresses the central nervous system. It can cause neurological impairment, liver and kidney damage, and at high concentrations, death."

Monitoring Survey and thereafter initiated ongoing investigations, surveys, and testing in the area. In 1978, the EPA confirmed that a well inside the Dico plant was contaminated with significant levels of TCE.

Dico was identified as a possible contributor to the TCE-polluted water because it used TCE as a solvent to degrease metal wheels produced at its plant. The wheels were allowed to drip dry on a concrete pad near a production well. Dico also spread waste sludge containing TCE around the perimeter of its facility as a method of dust control. The company voluntarily ceased these practices by January, 1979, after state and federal officials alerted it to the environmental implications.

**A.** *Coverage and notice clauses.* In August 1979—some months *subsequent* to Dico becoming implicated in the environmental investigation—Wausau began providing CGL coverage for the company. Policies were renewed annually through August 1985.[4]

The relevant coverage clause in Wausau's policy stated:

> The company will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as damages because of [property damage] ... to which this insurance applies, caused by an **occurrence,** and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such **bodily injury** or **property damage,** even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

The policy included the following notice requirements as conditions precedent to coverage:

4. The several policies will hereafter be referred to in the singular.

5. The D.C. Circuit Court of Appeals has succinctly explained the statutory scheme this way:

(a) In the event of an **occurrence,** written notice containing particulars sufficient to identify the **insured** and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the **insured** to the company or any of its authorized agents as soon as practicable.

(b) If claim is made or suit is brought against the **insured,** the **insured** shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

**B.** *EPA involvement.* During this coverage period, from 1979 to 1986, the EPA evaluated the contamination area, known as the "Des Moines TCE Site." The task was complicated by Des Moines' underground "gallery" drainage system, which moves water downward from Ingersoll Avenue, under Dico's property, and on to the river and water works. Several other industrial businesses and a landfill were, along with Dico, targeted in the EPA investigation.

Due to the level of TCE present and the proximity of the contamination to the city's drinking water supply, the Dico site was added in January 1981 to the list of potential or confirmed hazardous waste sites in the region. The EPA informed Dico that it would be "notified as to compliance status or of any violations of the environmental laws at issue." The Dico property was relisted in May 1981 when the EPA determined that the source of the TCE could have been from the sludge deposited for dust control. Using its Hazard Ranking System the EPA gave a high score to the risks associated with the site. Dico was notified in September 1983 that the Des Moines TCE Site, which included the Dico plant, would be included on the National Priorities List.[5]

> [CERCLA] authorizes the Environmental Protection Agency to establish a National Priorities List ("NPL"), identifying high priorities among the nation's known hazardous waste sites. The statute directs EPA to base the

The record indicates that by the summer of 1985, however, Dico had not yet been identified as a "potentially responsible party."[6] In fact, no "PRPs" had been named for the site.[7]

Although not yet named a PRP, Dico was closely monitoring the situation. In September 1985 Dico's general counsel wrote to company auditors to apprise them of various areas of potential liability. On the subject of environmental contamination, the letter stated:

Based upon information available to date, it appears likely that Dico will be identified as a potentially responsible party. Under CERCLA, if Dico is determined to be a responsible party, Dico will have joint and several liability with other responsible parties, if any, for all costs of any response action and injury to natural resources, including reasonable costs of assessing such injury.... *The amount and probable outcome of any such claims and the extent of insurance coverage, if any, cannot be assessed at this time.*

(Emphasis added.)

Also in September 1985, Dico's corporate counsel responded to an EPA request for information regarding Dico's hazardous substances insurance coverage. Dico represented to the EPA that "[i]f a claim is asserted against Dico, Dico will seek the benefits of any and all insurance coverage to which it may be entitled under its policies."

In early 1986, EPA officials held open meetings with parties interested in the Des Moines TCE Site. Representatives from area

---

listing criteria on "relative risk or danger to public health or welfare or the environment." ... The EPA has duly promulgated risk-based criteria under which a listing is triggered by either a high score on its Hazard Ranking System ("HRS") or by a "health advisory." *Mead Corp. v. Browner,* 100 F.3d 152, 153 (D.C.Cir.1996) (citations and footnote omitted).

Once a site is included on the NPL, it becomes eligible for remedial action financed by the Superfund. *See* 40 C.F.R. § 300.68(a) (1987). Site owners (as well as generators and transporters of hazardous substances) are ultimately liable for response actions, and EPA has the option of requiring the injuring party to perform response actions in the first instance, or reimburse the fund after response action has been taken. 42 U.S.C. §§ 9606–9607(a). *City of Stoughton v. United States Envtl. Protection Agency,* 858 F.2d 747, 749 (D.C.Cir.1988).

**6.** Under CERCLA, a potentially responsible party ("PRP") is:

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or

sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance....
42 U.S.C. § 9607(a).

The Eighth Circuit Court of Appeals has explained the extensive liability associated with being named a PRP:

Under CERCLA, if a responsible party, as defined by subsections (1) through (4), releases hazardous materials into the environment, and that release "causes the incurrence of response costs," then the party is liable. 42 U.S.C. § 9607(a).' The question then becomes, liable for what? CERCLA's answer is that the party is liable for "*any* other necessary cost of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B) (emphasis added). Thus, a plain reading of the statute leads us to the conclusion that once a party is liable, it is liable for its share, as determined by Section 9613(f), of "any" and all response costs, not just those costs "caused" by its release.
*Control Data Corp. v. S.C.S.C. Corp.,* 53 F.3d 930, 936 (8th Cir.1995) (footnote omitted).

**7.** One commentator has aptly characterized the difficulties faced by the EPA in identifying PRPs:

In theory, all PRPs should be located. In practice, however, this is extremely difficult to accomplish and highly impractical because of CERCLA's expansive liability structure, in which hundreds of parties may be associated with one site. As a result, PRP searches can be very costly, and it is not unusual for the EPA to identify the minimum number of parties to commence an action.
Karen L. Demeo, Note, *Is CERCLA Working? An Analysis of the Settlement and Contribution Provisions,* 68 St. John's L.Rev. 493, 502–03 (1994).

companies, including Dico officials and its outside counsel, attended. Discussed at the meetings were remedial goals and potential technologies for removal of the TCE contamination.

Dico was invited to a meeting on April 23, 1986, to discuss with the EPA terms of the proposed administrative order which would address liability for the contamination of the site. In the first week in May, Dico's insurance broker notified Wausau that it had received the proposed administrative order, but no formal claim had yet been made by the EPA. The notice letter stated:

> At a meeting of interested parties with the EPA held on April 23, 1986, it became apparent that the Agency expected negotiations over a proposed administrative order to progress very rapidly. Notice of this claim accordingly is being provided to you very promptly, such that Dico may consult and work with you on an expedited basis in connection with these negotiations.

Wausau acknowledged that it received the notice and would be evaluating the claim.

The EPA issued an administrative order on July 21, 1986, which Dico forwarded to Wausau on July 24. The order identified Dico as a responsible party pursuant to section 107(a) of CERCLA. Dico was ordered to "design, construct, operate and maintain the response action." The company turned to its CGL insurers for indemnification.

**C. *Court action.*** Dico brought suit in 1993 against Wausau. The petition sought damages for breach of contract and/or declaratory relief[8] related to remedial activities at the TCE site. Wausau denied coverage on grounds of late notice, taking the position that Dico had been aware of the ongoing EPA investigation since at least 1978 but failed to give notice until 1986.

The district court granted Wausau summary judgment based on its late notice defense. In a peculiar twist to the order rendering judgment, however, the court delayed dismissal of Dico's petition for three weeks,

giving the parties time to "comment" on the court's decision. Within the three-week period given by the court, Dico filed a motion for enlargement under Iowa Rule of Civil Procedure 179(b).

In its ruling on Dico's motion, the court not only declined to enlarge its findings but found the motion untimely because it was filed more than ten days following the court's summary judgment order. Dico appealed to this court within thirty days of the court's ruling on the rule 179(b) motion. Wausau moved to dismiss the appeal, claiming Dico's rule 179(b) motion was untimely and, therefore, insufficient to delay appeal from the court's summary judgment ruling. We ordered Wausau's motion to dismiss submitted with the appeal.

## II. Scope of Review.

Summary judgment is proper when the moving party proves no genuine issues of material fact exist and it is entitled to judgment as a matter of law. Iowa R. Civ. P. 237(c); *Met–Coil Sys. Corp. v. Columbia Cas. Co.*, 524 N.W.2d 650, 654 (Iowa 1994). On our review, we consider the record in the light most favorable to the non-moving party. *Met–Coil Sys.*, 524 N.W.2d at 654.

## III. Rule 179(b) Issue.

■ Before turning to the merits of the case, we address Wausau's claim that Dico's appeal is time barred. There is no question that appeal must be taken within thirty days from entry of final judgment, and a motion to amend and enlarge must be filed within ten days after the court's decision is filed. *See* Iowa R.App. P. 5; Iowa R. Civ. P. 247. These deadlines are mandatory and jurisdictional. *Bellach v. IMT Ins. Co.*, 573 N.W.2d 903, 905 (Iowa 1998).

Wausau contends that while an erroneous ruling on posttrial motions may not be appealable until entry of final judgment, the court's order rendering summary judgment

---

8. The petition stated in pertinent part:

 2. Dico seeks a declaration that the defendants are obligated, under the terms of their respective insurance policies, to defend the proceedings brought against Dico by EPA, to reimburse Dico for its reasonable defense costs already incurred, including costs of investigation, and to indemnify Dico for its past and future damages as a result of property damage at the Site.

here was immediately appealable. Moreover, Wausau argues, the district court's forty-five-page ruling put Dico on notice of the grounds supporting summary judgment—sufficient for a timely motion to enlarge. Its argument relies heavily on *Milks v. Iowa Oto–Head & Neck Specialists*, 519 N.W.2d 801 (Iowa 1994), and *Qualley v. Chrysler Credit Corp.*, 261 N.W.2d 466 (Iowa 1978). In *Milks* we said:

> [O]nce the jury returns its verdict, the parties are usually on notice of the result for purposes of determining whether to file a motion for a new trial. In *Qualley*, for instance, the court concluded that "when the court [in a nonjury case] issued its findings and conclusions it was obvious to plaintiff on which facts and law the court's impending judgment entry would be based."

*Milks*, 519 N.W.2d at 804 (quoting *Qualley*, 261 N.W.2d at 470).

Dico counters that this case is more analogous to *Egy v. Winterset Motor Co.*, 231 Iowa 680, 2 N.W.2d 93 (1942), in which judgment for the plaintiff was ordered by the court but counsel assumed the task of preparing a formal judgment "to give effect to the informal decision so expressed." *Egy*, 231 Iowa at 687, 2 N.W.2d at 96. There we held the time for appeal did not begin to run until the written ruling was filed, reasoning the losing party was without notice of the facts and conclusions upon which the court's forthcoming formal judgment would rest. *Id.* at 687, 2 N.W.2d at 97; *see Qualley*, 261 N.W.2d at 470.

We agree with Dico that *Egy*, not *Qualley* and *Milks*, controls the current controversy. By focusing on the length and detail of the district court's written ruling, Wausau overlooks the ruling's evident lack of finality. Because the court left the door open for further comment, Dico had no way of knowing whether the ruling would undergo revision based on comments by Wausau. Thus Dico had little choice but to wait to the end of the "grace period" to proceed with its motion to enlarge.

We cannot reconcile the district court's view that Dico's rule 179(b) motion was untimely with its open-ended invitation to submit revisions. The uncertainty injected into the proceedings by the court should not, in fairness, be used by Wausau to defeat Dico's appeal on the merits. We thus overrule Wausau's motion to dismiss the appeal.

## IV. Notice.

The controlling question on appeal is whether the court erred when it ruled, as a matter of law, that Dico's notice to Wausau was untimely, relieving Wausau of its duties under the policy. We summarized the framework for such analysis in *Met–Coil Systems Corp. v. Columbia Casualty Co.*:

> When a notice provision is written as a condition precedent to policy coverage in an insurance contract, substantial compliance with such a condition must be shown by the claimant. Absent the claimant proving substantial compliance, in order to maintain the action against the insurer the claimant must show that failure to comply was excused, or that the requirements of the condition were waived, or that failure to comply was not prejudicial to the insurer.

*Met–Coil Sys.*, 524 N.W.2d at 654 (citations omitted).

This analysis prompts two initial questions: Was notice a condition precedent to coverage under the Wausau policy and, if so, did Dico substantially comply with the notice requirement?

Wausau's policy requires notice in two situations. "In the event of an occurrence," the insured must provide written notice as soon as practicable. "If claim is made or suit is brought," the insured must, under the policy, "immediately forward to the company every demand, notice, summons or other process" it has received.

■ **A.** *Occurrence.* Turning to the first situation, Wausau's policy defines an occurrence as "an accident, including continuous or repeated exposure to conditions, which results in **bodily injury** or **property damage** neither expected nor intended from the standpoint of the **insured.**" We recently considered the term "accident" in the context of a pollution "occurrence" in *Iowa Compre-*

*hensive Petroleum Underground Storage Tank Fund Board v. Farmland Mutual Insurance Co.*, 568 N.W.2d 815, 818 (Iowa 1997). There we held that "accident" means "an unexpected and unintended event." *Iowa Comprehensive Petroleum*, 568 N.W.2d at 818. While recognizing that the "occurrence" of the first drop of leakage might be sudden, we concluded that ground contamination, occurring over a period of time, falls outside the definition of "accident." *Id.* at 819. Applying these definitions to the case before us, it appears plain that Dico's contamination of its production well and soil, which resulted from manufacturing procedures and dust control occurring over a long period of time, were not "occurrences" triggering notice—or, potentially, coverage—under Wausau's policy.[9]

■ **B.** *Claim.* As for the notice required of an insured in the event of a "claim made," the district court applied—and Wausau urges on appeal—a broad reading of the term "claim." Wausau contends that correspondence between the EPA and Dico in 1981 and 1983 concerning the ground contamination were "claim letters." Dico counters that these preliminary discussions were far from "claims" as contemplated by Wausau's policy and as applied in the context of a CERCLA action. We agree.

Wausau's policy does not define "claim." The policy, however, states: "The company will pay on behalf of the **insured** all sums which the **insured** shall become *legally obligated* to pay as damages." (Emphasis added.) This is consistent with the commonly understood definition of "claim" as "a demand for something due or believed to be due {insurance}." Webster's Collegiate Dictionary 210 (10th ed.1993). Also consistent with this notion of legal obligation, the policy requires the insured to accompany any "claim made" with "every demand, notice, summons or other process" the insured has received.

In *A.Y. McDonald Industries, Inc. v. Insurance Company of North America*, we not-

ed that EPA enforcement procedures have moved "away from the use of law suits toward the use of agency demands for participation in remedial action." *A.Y. McDonald Indus., Inc. v. Insurance Co. of N. Am.*, 475 N.W.2d 607, 628 (Iowa 1991) (quoting *Hazen Paper Co. v. United States Fidelity & Guar. Co.*, 407 Mass. 689, 555 N.E.2d 576, 581 (1990)). Thus we concluded an EPA demand letter was substantially equivalent to commencement of suit for purposes of triggering the insurer's duty to defend. *Id.* In reaching this conclusion, we highlighted the responsibility shouldered by an insured once EPA demands have been made:

> The prospects of avoiding financial responsibility [are] minimal because liability is not based on fault and the available defenses are very limited. Moreover, the risk to which [the insured is] exposed [is] substantial because, as a practical matter, its liability is joint and several. Early involvement in the settlement discussions is thus often crucial to protect one's interests. Any court action by EPA is limited to the administrative record, and judicial review considers only whether the EPA "decision was arbitrary and capricious or otherwise not in accordance with law." Thus participation in the development of that record can be crucial. Settlement of EPA claims against potentially responsible parties, with protection against claims for contribution, is a desired goal. The situation [is] such that the opportunity to protect [the insured's] interests could well [be] lost, long before any lawsuit would be brought. It would be naïve to characterize [an] EPA [demand] letter as a request for voluntary action. [The insured has] no practical choice other than to respond actively to the letter.

*Id.* (citing *Hazen*, 555 N.E.2d at 581–82) (citations omitted).

Here, unlike the situation in *A.Y. McDonald*, no petition had been filed before Wausau received notice of Dico's claim.

---

9. The record also reveals a second "plume" of contamination discovered in 1988 appearing to originate *north* of Dico's property. It remains to be determined whether this newly discovered plume resulted from an "occurrence" covered under the Wausau policy. But the timeliness of notice to Wausau of this additional contamination—discovered, as it was, *after* Wausau came into the case—can hardly be questioned.

More importantly, the early correspondence between the EPA and Dico—which Wausau contends triggered notice—implied no duty to mount a defense. To the contrary, when the EPA informed Dico that the area would be listed as a potentially hazardous waste site, it advised Dico that "you will be notified as to compliance status or of any violations of the environmental laws at issue."

Moreover, mere correspondence between the EPA and an insured concerning hazardous waste disposal would not necessarily develop into a claim. Under CERCLA, a "claim" is defined as "a demand in writing for a sum certain." 42 U.S.C. § 9601(4). Here, several businesses in the area of the Des Moines TCE Site were included in the EPA's investigation and attended many of the information meetings along with Dico. Ultimately, Dico was named as a responsible party and assigned liability for the site's cleanup. But that assignment of liability did not occur until July 1986.

We recently held in *Fireman's Fund Insurance Co. v. ACC Chemical Co.*, 538 N.W.2d 259, 265 (Iowa 1995), that an insured's lack of compliance with notice requirements can be determined as a matter of law when the delay is measured in terms of months and years. In *Fireman's Fund*, the insured did not directly notify its CGL insurer until five years after it negotiated a consent decree with the EPA. *Fireman's Fund*, 538 N.W.2d at 265. Here the question of substantial compliance with notice requirements comes down to a matter of weeks— from April 18, when Dico received the proposed administrative order, to May 7 when Dico informed Wausau of the EPA's imminent action. We said in *Fireman's Fund* that, "[o]rdinarily, the question of whether a notice has been reasonably given is one of fact for the jury." *Id.* at 262. Under the record before us we cannot say as a matter of law that Dico failed to substantially comply with Wausau's notice requirements. The district court erred when it ruled otherwise.

Our decision makes it unnecessary to consider appellant's remaining arguments. We reverse the judgment of the district court and remand for further proceedings.

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.