Walter DROEMER et al., Appellants,

v.

TRANSIT MIX CONCRETE OF GONZALES, INC., Appellee.

No. 537.

Court of Civil Appeals of Texas, Corpus Christi.

July 23, 1970.

Rehearing Denied Aug. 18, 1970.

R. L. Miller, of Miller, Vollentine & Miller, Gonzales, for appellants.

Denver E. Perkins, Gonzales, for appellee.

## OPINION

NYE, Justice.

This is a suit brought by the plaintiff Transit Mix Concrete of Gonzales, Inc. on a verified account for amounts allegedly due and payable under a contract to supply ready-mix concrete to the defendant Walter Droemer. The case was tried before the court without a jury. Judgment was rendered against Droemer and the Fidelity and Deposit Company of Maryland (surety on defendant's payment bond) for the unpaid balance found to be due. The defendants have perfected this appeal.

The basic question is what was the agreed price that was to be paid for the concrete furnished by plaintiff Transit Mix Concrete of Gonzales, Inc. to defendant Walter Droemer. The parties will be referred to hereafter as they were in the trial court.

Defendant was the successful bidder to construct a new high school building in Gonzales, Texas. The plaintiff was a subcontractor and supplier of the ready-mix concrete that went into the job. The facts are relatively undisputed and the evidence supports the findings of fact and conclusions of law supplied by the trial court. We therefore affirm the judgment accordingly.

Many duplicate plans and specifications for the building were left in the office of the school superintendent for interested bidders and subcontractors. The plaintiff obtained a copy of the plans and specifications as they related to the concrete and thereafter furnished the defendant with a written bid on August 30, 1966. The original bid was as follows:

"I am pleased to quote the following prices for the materials listed on the new Gonzales High School Building.

| | | |
|---|---|---|
| 5 Sack 3,000 lb. Concrete | — | $13.50 per yd. |
| Admixtures – ¼ lb. #8 Pozzolith per sack | — | .50 per yd. |
| 1½″ Washed Gravel | — | 2.94 per ton |
| Mortar Sand | — | 4.85 per yd." |

The prime contract provided that the contractor shall furnish all materials shown on the drawings and specifications. Certain designs were to be determined and tests were to be performed before the concrete would be acceptable. The relevant provisions are:

"(1) Proportions of the concrete design shall be determined by an independent testing laboratory selected by the Architect. The design furnished will be such as to produce the 28 day compressive strength called for in the structural drawings. Design and preliminary (7) seven day compressive tests will be made sufficiently in advance of the work to obtain approval from the Engineer. The Contractor shall furnish all tests and designs."

\* \* \* \* \* \*

"(3) The results of all concrete tests will confirm that the concrete meets the design strengths specified and called for in the plans. All materials and concrete design are subject to the Engineer's approval prior to commencement of work."

Under "Concrete Quality & Strength" there appear the following relevant provisions:

"CONCRETE QUALITY & STRENGTH:

"(1) Concrete shall develop a compressive strength as designated by the Engineer and as shown on the structural drawings * * *."

"(2) The proportions of concrete materials will follow the design mix specified above * * *."

*       *       *       *       *       *

"(4) * * *. One quarter pound (¼) of #8 Pozzolith per sack of cement shall be included in the design of all concrete."

The structural drawings contain the following provision:

"All concrete shall be proportioned to develop a min. of 3000 P.S.I. in compression within 28 days."

On or about the 9th day of September 1966 defendant learned that he was awarded the contract. While the defendant was in Gonzales, he met with the plaintiff at his plant. While defendant was visiting with the plaintiff and looking over the plant, the two engaged in a conversation relative to furnishing concrete for the job. Defendant told the plaintiff that ever since he had been in Gonzales, he had been bombarded by people because of arrangements that he had made previously to buy his concrete from an out of town supplier. He told plaintiff that he would like very much for him to supply the job, and would in fact prefer to do business with a local business rather than with an outsider. However, he said that he had a lower price that he had based his successful bid upon. The plaintiff asked him how much lower. He said: "twenty-five cents." Plaintiff then said: "Well, that would *make the concrete* thirteen twenty-five plus the admixtures." The defendant said *"Yes"*, and plaintiff said: *"Well, we will do it for that"*, and defendant said: "Okay. Fine. What kind of cement can

we use?" They agreed upon the type to be used, shook hands and wished each other well and left. (emphasis supplied)

The contention made by defendant is that plaintiff's original bid which called for five sacks at $13.50, when reduced by a ½ sack to 4½ sacks of concrete as the final specifications called for, should have also reflected a reduction in the price of 50¢ to $12.75, plus the additives. The defendant contended that local practice was that the price of concrete would vary up or down by 50¢ for each half sack of cement used.

The plaintiff argues that the parties made a new specific oral deal for the concrete at $13.25; that he was required to furnish the concrete to the defendant so that it met the design specifications at this agreed price; and that the 50¢ per half sack variance as contended by defendant did not form any part of the agreement. We agree that the evidence is sufficient to support plaintiff's contentions.

The record shows that during plaintiff's conversation with defendant, nothing was said about the cement content for a yard of concrete. Defendant testified that he "had a lower bid" and asked the plaintiff to lower his price by 25¢. He did not mention any cement content by sacks, nor any price by the yard based on the content of cement. He did not testify specifically as to any other proposal that he had "in his pocket" that showed a sack content or a price by the yard based on a specific number of sacks. Defendant did not give any details of his lower bid, or the name of the lower bidder.

After the oral agreement between the parties had been made, Trinity Testing Laboratory gave the plaintiff, the defendant and the architect a design formula for a cubic yard of concrete for the job. The testing laboratory required 423 lbs. of cement, 1440 lbs. of sand, and 2075 lbs. of gravel. To this 1⅛ pounds of pozzolith was to be added. The laboratory reported that this design formula would produce a minimum of 3000 p. s. i. in compression within twenty-eight days. At 94 pounds of cement

to the sack, 423 pounds would amount to 4½ sacks.

The record shows that both parties acted upon the agreement until the contract was almost completed. The delivery of the first concrete was in October 1966. Thereafter, based on plaintiff's billings, the defendant paid plaintiff $13.25 per cubic yard using 4½ sacks of concrete. During the months of November 1966 through October 1967 plaintiff delivered and defendant received approximately 4185 yards of mixed concrete, or approximately 95% of the total amount due under the contract. Defendant paid the plaintiff the sum of $52,786.14 through October 31, 1967, or approximately 92% of the total amount due based on these invoices. The defendant made no complaint to plaintiff's foreman relative to the price charged the defendant. On at least one occasion, defendant personally receipted and signed one of the detailed invoice slips. It was not until the latter part of October 1967 that the defendant made complaint of the 50¢ per cubic yard that was alleged to be an overcharge. All of the receipted invoices were signed by defendant or his employees and showed a price that was based on 4½ sacks of $13.25 per yard plus the pozzolith additive. Copies of such invoices were left with the defendant or his agent.

■ It is undisputed that plaintiff's original written bid was not accepted by the defendant. Defendant's counter offer (a reduction of price by 25¢) did not call for a specific number of sacks to be used but only impliedly called for concrete to be furnished in accordance with the plans and specifications. No mention of the number of sacks that were to be used was specified anywhere, other than in plaintiff's first bid. If defendant was to take advantage of the number of sacks of cement specified in the original written offer by the plaintiff to him, he would have been obliged to have accepted plaintiff's offer without qualification, or include the number of sacks to be used in his new offer. The acceptance must be identical with the offer to make a binding contract. United Concrete Pipe Corp. v. Spin-Line Co., 430 S.W.2d 360 (Tex.Sup. 1968); National Furniture Mfg. Co. v. Center Plywood Co., 405 S.W.2d 115 (Tex. Civ.App.–Tyler 1966). A meeting of minds respecting the subject matter of a contract, is essential for its consummation.

■ If a contract is doubtful or ambiguous in its meaning, the acts of the parties themselves, in the course of the performance of the contract, are entitled to great weight to aid the court in its interpretation. Our courts rightfully assume that the parties to a contract are in the best position to know what was intended by the language they employed, by their subsequent acts relative to it. Lone Star Gas Co. v. X-Ray Gas Co., 139 Tex. 546, 164 S.W.2d 504 (1942). It is clear to us that the defendant had both actual and constructive knowledge that the billing made by plaintiff to him was for 4½ sacks of cement. This met the plans and specifications (i. e. 300 p. s. i. compression test at $13.25 per yard plus the additive). The offer and acceptance occurred when the defendant said that he had a lower bid—the plaintiff asked "how much". The defendant replied "twenty-five cents lower". The plaintiff said *"That will make the concrete for the job thirteen dollars and twenty-five cents plus add mixtures."* To this they both agreed. The trial court found that the defendant agreed with the plaintiff to pay $13.25 per cubic yard plus 50¢ per cubic yard for the additive; that this price would include the use of 4½ sacks of cement to produce the required breaking strength as mentioned in the plans and specifications; and that the parties, by their acts, interpreted the agreed price to be this amount. We hold that this oral agreement was clear, but when coupled with the construction of the contract given by the parties themselves, it precluded any other meaning. Stewart & Co. v. Law, 149 Tex. 392, 233 S.W.2d 558 (Tex.Sup.1950).

Judgment of the trial court is affirmed.