United States Court of Appeals
Fifth Circuit

**F I L E D**

**September 19, 2005**

Charles R. Fulbruge III
Clerk

REVISED OCTOBER 18, 2005

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 04-10311

INTERNATIONAL INSURANCE CO.,

Plaintiff-Counter Defendant-Appellant,

VERSUS

RSR CORPORATION, ET AL,

Defendants,

RSR CORPORATION; QUEMETCO, INC.; QUEMETCO METALS LIMITED, INC.;
formerly known as MURPH METALS, INC.,

Defendants-Counter Claimants-Appellees.

Appeal from the United States District Court
For the Northern District of Texas

Before WIENER, BARKSDALE and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

The principal issues in this case are whether the jury's finding that a claim was made under a claims-made Environmental Impairment Liability ("EIL") insurance policy was (1) properly guided by an instruction that defined a "claim" as "an assertion by a third party ... that the insured is liable to it for damages...."; and (2) supported by (a) undisputed facts and conclusions of law:

1

the substantial lead pollution on Harbor Island near Seattle emanating from the insured's lead smelting establishment; the Environmental Protection Agency ("EPA")'s listing of Harbor Island on the National Priorities List; the liability of the insured under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 USCA §9601, et seq., to the EPA for the cost of environmental remediation on Harbor Island; the virtual certainty of further investigative or enforcement actions by the EPA in respect to Harbor Island; and (b) the uncontested extrinsic evidence that, under the parties' interpretation of the insurance contract, a claim was made by the EPA against the insured and reported to the insurer during the policy period in respect to the lead pollution on Harbor Island.

The EIL insurer, International Insurance Company ("International"), appeals from a judgment based on the jury verdict in favor of its insureds, RSR CORPORATION; QUEMETCO, INC.; QUEMETCO METALS LIMITED, INC.; formerly known as MURPH METALS, INC.; BESTOLIFE CORPORATION; and REVERE SMELTING & REFINING CORPORATION OF NEW JERSEY (collectively,"RSR"), declaring that International is obliged under the EIL policy to indemnify RSR for any remediation costs and expenses RSR is obligated to pay to the EPA, with respect to the EPA's remediation of lead pollution at the Harbor Island site. Applying Texas law to this diversity case, we affirm, concluding that under the circumstances of this case the evidence is sufficient to support the jury's determination that a claim was

made against RSR by the EPA within the EIL policy coverage period;
and that the errors attributed to the district court in pre-trial
rulings and jury instructions were either not proven or harmless
because they could not have affected the outcome.

## I.  BACKGROUND

International Insurance Company is the successor-in-interest
of North River Insurance Company ("North River"), which issued the
EIL policy to RSR and other related entities in 1981.  The EIL
policy had a policy period of September 4, 1981 to November 4, 1982,
with an extended reporting period until November 4, 1983.  In
December 1982 the EPA announced in a press release that Harbor
Island would be placed on its proposed National Priorities List
("NPL").  RSR notified North River orally and in writing of the
EPA's placement of Harbor Island on the proposed NPL.  On or about
January 6, 1983, RSR forwarded by way of its insurance broker, to
North River, a copy of the press release issued by the EPA dated
December 20, 1982.  In the mid-to-late 1980's, North River's counsel
requested from Clarice Davis, RSR's counsel, the status of the
Harbor Island EPA matters to which RSR had given North River notice
under the EIL policy.  RSR's counsel complied with the request by
sending North River's counsel status reports regarding EPA activity
relating to Harbor Island.  On September 8, 1983 the EPA placed the
Harbor Island site on its final NPL.  In  the listing, the EPA
explained that "[p]ublication of sites on the final NPL will serve
as notice to any potentially responsible party ("PRP") that the

3

Agency may initiate Fund-financed response actions." 48 Fed. Reg. 40658-40673. In late 1983, RSR sold the Harbor Island lead smeltery to Bergsoe Metals, which was owned by East Asiatic. On July 31, 1986 the EPA determined that Quemetco Realty, Inc., one of the RSR entities, was a potentially responsible party with respect to the environmental impairment of Harbor Island. The EPA requested information from Quemetco as to the ownership of the site and the activities being performed there along with other salient facts. The letter stated that as a potentially responsible party, Quemetco may be liable for all monies expended for corrective actions at the site. On May 22, 2000 the EPA filed a CERCLA action against RSR in federal district court for the Western District of Washington, seeking recovery from RSR for response costs that the EPA expended in remedial action at Harbor Island, as well as for any future costs it expends at Harbor Island. The EPA seeks in excess of $8 million in recovery of its response costs at Harbor Island. The complaint was not served on RSR until the summer of 2000. At certain points in time, RSR believed that the EPA would not hold it liable for the Harbor Island response costs, because Bergsoe Metals, in purchasing the lead smelting facility, had agreed to indemnify and reimburse RSR for such costs; and RSR believed that a jury had found that East Asiatic was the alter ego of Bergsoe Metals.

International filed this action in the federal district court in the Northern District of Texas on February 2, 2000, seeking a declaratory judgment that International was not obliged to indemnify

4

or reimburse RSR for CERCLA remediation costs at West Dallas; RSR filed a counterclaim against International for a declaratory judgment that it was entitled to coverage for the EPA's costs of environmental remediation of both West Dallas and Harbor Island; and International amended its petition to request a declaratory judgment that it was not required to afford coverage to RSR for the EPA's remediation costs at either West Dallas or Harbor Island.[1] International moved for summary judgment contending that it was not obligated to indemnify RSR for such remediation costs. The district court denied International's motion because issues of material fact existed regarding whether the EPA had made a "claim" against RSR in connection with the Harbor Island site during the policy period and whether RSR had waived its right to coverage for the site.

At trial, two issues were submitted to the jury to decide in answer to interrogatories; all other issues were reserved for decision by the court. After the close of evidence, the jury returned its verdict finding that the EPA made a claim upon RSR for environmental response costs during the EIL policy coverage period; and that International had not proved that RSR waived its right to coverage under the EIL policy. Based on these findings and the evidence introduced at trial the district court rendered a

---

[1] The district court separately tried and rendered a declaratory judgment pertaining to coverage issues under the EIL policy in respect to the environmental impairment related to RSR's lead smeltery at West Dallas. International and RSR appealed from the parts of the judgment adversely affecting each of them, and those appeals will be decided in No. 03-11272 on our docket.

declaratory judgment decreeing that International was contractually obligated to indemnify RSR against its liability to the EPA for the costs of remediation under CERCLA of the environmental impairment at Harbor Island. The district court denied International's motions for judgment as a matter of law and for a new trial. International timely appealed.

## II. ISSUES ON APPEAL

International raises six issues on appeal, contending that: (1) The definition of "claim" in the district court's jury charge was legally erroneous because it did not require that the jury find, in addition to an assertion by the EPA of RSR's liability to it, that the EPA demanded money or action from RSR; (2) the supplemental jury instruction misled and confused the jury because it conflicted with the definition of "claim" in the jury charge; (3) the evidence was insufficient to support a jury finding that the EPA asserted that RSR was liable to it for damages within the risks covered by the EIL policy; (4) the district court abused its discretion in admitting the testimony of John Morrison because it contained privileged attorney-client communications; (5) the district court abused its discretion in excluding an excerpt from the deposition of Donald Brayer as evidence of his expert opinion; and (6) the jury's finding that RSR did not waive its right to coverage under the EIL policy was contrary to the great weight and preponderance of the evidence.

III. ANALYSIS

A. The EIL Policy

The EIL policy provides two types of coverage relevant to this case: (1) indemnification of the insured against liability for environmental impairment damages; and (2) reimbursement of the insured for costs and expenses of its voluntary cleanup operations performed with the insurer's consent.

First, in Insuring Agreement 1, the insurer agrees to indemnify the insured against all sums that the insured shall be obligated to pay for damages by reason of liability imposed on the insured by law on account of:

(a) Personal injury;

(b) Property damage;

(c) Impairment or diminution or other interference with any other environmental right or amenity protected by law;

arising within the Territorial limits designated in the Declarations [here, the United States] and caused by Environmental impairment in connection with the Business of the insured at the locations designated in the Declarations in respect to which a claim has been made against or other due notice has been received by the insured during the Policy Period.

Second, in Insuring Agreement 3, the insurer promises to

reimburse the insured for costs and expenses of operations outside the insured's premises designed to remove, neutralize, or clean up any substance released or escaped which had caused Environmental impairment, or could cause Environmental impairment if not removed, neutralized, or cleaned up, to the extent that such costs and expenses have been incurred or have become payable by the insured as a result of a legal obligation or in the endeavor to avert a loss covered by the Policy, provided

7

that such costs and expenses, except in respect of emergency measures undertaken to avert loss, are incurred with prior written consent of insurer, such consent not to be unreasonably withheld.

The EIL policy does not explicitly define "claim."[2] Nevertheless, the policy limits coverage to sums the insured is liable for because of environmental impairment causing personal injury, property damage, damage to environmental rights "in respect to which a claim has been made against or other due notice has been received by the insured during the Policy Period."(underline added). And the policy contains a condition which provides: **"Notification of Claims**: "The insured upon knowledge of any accident or occurrence likely to give rise to a claim hereunder shall give written notice to the Company or its nearest authorized representative as soon as practicable."(underline added).

The EIL policy coverage provisions correspond to the recognition by a majority of federal and state courts that "damages"

---

[2] The policy includes a provision labeled "definition of claim" which fails to define the term comprehensively. That provision merely states that a claim "comprises any single claim or any series of claims from one or multiple claimants resulting from the same isolated, repeated, or continuing environmental impairment." According to Todd I. Zuckerman and Mark C. Rasskoff, 2 ENVIRONMENTAL INSURANCE LITIGATION LAW AND PRACTICE § 11:3 (2001), one commonly used EIL policy form specifically defined claim as follows: "Claim means, whenever used in this policy, a demand received by the insured for money or services, including the service of suit or institution of arbitration proceedings against the insured." Id. § 11:3 at 11-4. "Reprinted with permission. Copyright Insurance Services Office, Inc., 1984." Id. at 11-3 n. 1. Evidently, some companies in the insurance market regarding pollution liability insurance were aware of the ambiguity of the term "claim" and the need for an insurer to specifically define it in the policy if the insurer wished it to be understood in the sense most favorable to the insurance company.

under CERCLA include environmental response, remediation and cleanup costs payable by insureds because of potential or actual legal proceedings by the EPA or other third parties.[3]  For example, under Texas law, environmental remediation or cleanup costs are "damages" within the meaning of an insurance policy that provides indemnity for all sums which the insured is obligated to pay by reason of liability imposed by law for damages, whether incurred by the federal government under CERCLA or by an individual who voluntarily undertakes the task of cleaning up hazardous waste.  SnyderGeneral, 113 F.3d at 539 ("[Environmental cleanup costs, whether incurred by the government under CERCLA or by an individual who voluntarily undertakes the task of cleaning up hazardous waste, are damages and are thus covered by the language of Century's policy."); Bituminous, 75 F.3d at 1053 ("Under the Texas rule that uncertainties as to insurance coverage ... should be decided in favor of the insured, we conclude that government cleanup costs incurred in responding to

---

[3] See SnyderGeneral Corp. v. Century Indem. Co., 113 F.3d 536, 539 (5th Cir. 1997); Bituminous Cas. Corp. v. Vacuum Tanks Inc., 75 F.3d 1048, 1053 (5th Cir. 1996); Independent Petrochemical Corp. v. Aetna Cas. & Sur. Co., 944 F.2d 940, 946-47 (D.C. Cir. 1991); Aetna Cas. and Sur. Co. v. Pintlar Corp., 948 F.2d 1507, 1511-12 (9th Cir. 1991); United States Aviex Co. v. Travelers Ins. Co., 336 NW.2d 838, 843 (Mich. App. 1983)(distinction between government recover for cleanup costs and natural resources damages "merely fortuitous"); Anderson Dev. Co. v. Travelers Indem. Co., 49 F.3d 1128, 1133 (6th Cir. 1995)("[R]esponse and environmental clean-up costs mandated by EPA constitute damages.  The fact that the insurer cooperates and assumes the obligations to conduct the clean-up, rather than forcing the EPA to incur the expenses of a clean-up and then bring a coercive suit, does not change the bottom line that a legal obligation exists."); Morton Intern., Inc. v. G. General Acc. Ins. Co. of Am., 629 A.2d 831, 845 (N.J. 1993); see also 46 TEX. PRAC., ENVIRONMENTAL LAW § 33.8 (2d ed).

the dumping of hazardous waste on property, and imposed on the insured by CERCLA, are covered by the language in the policy...."). Today, a majority of courts have abandoned the technical legal/equitable distinction between types of damages altogether and have found that "damages" may include "response costs" "cleanup costs" and costs of remediation under CERCLA; and that contamination to air, soil and groundwater resulting from pollution can properly be characterized as "property damage."[4]

---

[4] See, e.g., Gerrish Corp. v. Universal Underwriters Ins. Co., 947 F.2d 1023 (2d Cir. 1991); New Castle County v. Hartford Acc. & Indem., 933 F.2d 1162 (3d Cir. 1991); Avondale Indus. Inc. v. Traveler's Indem. Co., 887 F.2d 1200, 1206-07 (2d Cir. 1989); Port of Portland v. Water Quality Ins. Syndicate, 549 F. Supp. 233 (D. Or. 1982) aff'd in part and rev'd in part 796 F.2d 1188 (9th Cir 1986); Zuckerman and Rasskoff, 2 ENVIRONMENTAL INSURANCE LITIGATION LAW AND PRACTICE at § 3.5.

In cases discussing environmental coverage, most courts have found policies to cover an insured's voluntary cleanup of the contamination prior to government demand and money owed to the government after it intervenes. See, e.g., Port of Portland, 549 F. Supp. 233; Metex Corp. v. Federal Ins. Co., 675 A.2d 220, (N.J. 1996); Weyerhaeuser Co. v. Aetna Casualty and Surety Co., 874 P.2d 142 (Wash. 1994) (en banc); Upjohn Co. v. New Hampshire Co., 444 N.W.2d 813, 819 (Mich. App. 1989), appeal granted in part, 435 Mich. 862 (Mich. App. 1990), and denied in part, 435 Mich. 864 (Mich. App. 1990), rev'd on other grounds, 438 Mich. 197, 476 N.W.2d 392 (1991) (explaining that it made "no different that the insured took remedial action before being ordered to do so," adding that it was "clear from the damage caused by the spill that had [the insured] not acted, the damages would have been much greater," and that such quick remedial action should be "encouraged"); Broadwell Realty v. Fidelity & Cas. Co., 218 N.J. Super. 516, 528 A.2d 76 (N.J. App 1987); Compass Ins. Co. v. Cravens, Dargen & Co., 748 P.2d 724 (Wyo. 1988).

A minority of courts have drawn distinctions between voluntary cleanups, those mandated by administrative agencies and those mandated by court order. See e.g., Certain Underwriters at Lloyd's of London v. Super. Ct., 16 P.3d 94, 103-05(Cal. 2001); Northern Illinois Gas Co. v. Home Ins. Co., 777 N.E.2d 417, 421-22 (Ill. App. 1st Dist. 2002).

Consequently, we conclude that our decisions in SnyderGeneral and Bituminous apply with equal force to require coverage under Insuring Agreement 1, when properly triggered, against damages payable by the insured for environmental remediation under CERCLA by the EPA. The EIL policy covers "all sums which the insured shall be obligated to pay ... for damages by reason of the liability imposed upon the insured by law on account of ... personal injury ... property damage ... [or] impairment of ... any other environmental right...." Under the Texas rule that uncertainties as to insurance coverage set out in the policy should be decided in favor of the insured,[5] we conclude that if a claim was made against RSR within the policy period, the EPA's costs of response, cleaning and remediation imposed on RSR by CERCLA because of the lead pollution at Harbor Island, are covered by this language in Insuring Agreement 1 of the policy. Agreement 3 of the EIL policy provides an ancillary type of first party insurance in the form of "reimbursement [to the insured for its voluntary] costs and expenses of operations outside [its] premises designed to remove, neutralize or clean up any substances released" when undertaken with the prior approval of the insurer. But in doing so, the policy manifests no intent to create a technical category for "clean up," "neutralizing" or "removal" costs to be excluded from coverage for indemnity against compulsory or involuntary liability to a third person for damages under Agreement 1. Agreement 3 allows the insurer by

_____

[5] See Bituminous, 75 F.3d at 1053.

11

reimbursements to finance the insured's immediate voluntary cleanup efforts, which usually benefit both insureds and insurers by mitigating delay, environmental damage, and remediation costs, but also allows the insurer to exercise control over the insured's expenditures.

RSR seeks a declaratory judgment that it is entitled to coverage under Insuring Agreement 1 for indemnity against any sum it is held liable to pay in damages by the EPA under CERCLA because of the lead pollution at Harbor Island. RSR has not performed any voluntary operations to repair the environmental impairment of Harbor Island and does not seek any reimbursement under Agreement 3.

The district court's declaratory judgment and order denying International's motion to modify, alter and amend judgment are consistent with our interpretation of the EIL policy, RSR's pleadings, the evidence of record, and the jury's verdict. The declaratory judgment, in pertinent part, decrees that: "[International] is contractually obligated to indemnify RSR for any remediation costs and expenses that RSR is or becomes obligated to pay to the [EPA] with respect to the EPA's remediation activity at the Harbor Island site in Seattle, Washington ..." within the policy limits and exclusions.

After the judgment was rendered, International moved to modify, alter and amend it, contending that the judgment is overbroad and grants RSR more relief than that to which it is entitled.

12

International contended that the only issues tried were the issues submitted to the jury and that the issue of indemnification was not before the court when the case went to trial. The district court disagreed and pointed out that: In its counterclaim RSR specifically sought a declaration that International was obligated to indemnify RSR for claims arising out of the Harbor Island site. International raised only the specific defenses submitted to the jury even though the court had made it clear that International was to raise and try any and all issues that could and should have been raised; and the court also stated at that time that there was no need to piecemeal the litigation any more than necessary. The district court in its order stated: "Thus, the court disagrees with International that the only issues tried were the issues submitted to the jury and that the issue of indemnification was not before the court when the case went to trial."

Consequently, because the district court in approving the pretrial order and in ruling on the motions for summary judgment expressed the view that RSR was entitled to coverage for indemnification against liability to the EPA only under Insuring Agreement 3, we conclude that the district court in trying the issue of indemnification that was not submitted to the jury may have continued with that mistaken view of Insuring Agreements 1 and 3 or realized that RSR is entitled to indemnification against EPA claims under Agreement 1 instead of Agreement 3. In any event, we conclude that the district court's erroneous pre-trial contractual

13

interpretation error in this respect, if not corrected by the district court itself, was harmless, because the district court reached results in both its declaratory judgment and its post judgment rulings that are consistent with the correct interpretation of the policy.

## B. Discussion of Issues

1. The District Court's Jury Charge Defining "Claim" Was Not Legally Erroneous; Does nNt Create Substantial and Ineradicable Doubt Whether the Jury Was Properly Guided in its Deliberations; and Could Not Have Incorrectly or Unjustly Affected the Outcome of the Case.

International challenges the definition of the term "claim" the district court provided to the jury in the jury instructions. The district court arrived at the definition of "claim" it presented to the jury by noting first that the insurance contract does not contain a definition of "claim"; that Fifth Circuit precedent providing that determination of whether a "claim" was made under a claims-made policy that does not define the term requires a fact-specific analysis on a case-by-case basis (citing Fed. Deposit Ins. Corp. v. Mijalis, 15 F.3d 1314, 1331 (5th Cir. 1994)); and finally, that Texas law instructs that insurance contracts are construed strictly against the insurer if a term has more than one possible meaning (citing Grain Dealers Mut. Ins. Co. v. McKee, 943 S.W.2d 455, 458 (Tex. 1997) and Adams v. John Hancock Mutual Life Ins. Co., 797 F. Supp. 563, 567 (W.D. Tex. 1992)).

Thus, the district court found that, because the word "claim"

14

is ambiguous and not defined in the policy, Texas law required it to apply that meaning of the word which is most favorable to the insured.  Accordingly, the district court instructed the jury that:

> [T]he term "claim" means an assertion by a third party, that in the opinion of the third party, the insured is liable to it for damages within the risks covered by the policy, whether or not there is reason to believe that there actually is liability.  An insured's mere awareness of a potential claim is not a claim.  A claim does not require the institution of formal proceedings.

There are three requirements that must be met to successfully challenge a jury instruction.[6]  First, the challenger must demonstrate that the charge as a whole creates "substantial and ineradicable doubt whether the jury has been properly guided in its deliberations."[7]  Second, even if the jury instructions were erroneous, we will not reverse if we determine, based upon the entire record, that the challenged instruction could not have affected the outcome of the case.[8]  Third, the appellant must show that any proposed instruction it contends should have been given was offered to the district court and correctly stated the law. "Perfection is not required as long as the instructions were generally correct and any error was harmless."[9]  In sum, "[g]reat latitude is shown the trial court regarding jury instructions."

---

[6] Taita Chem. Co. Ltd. v. Westlake Styrene, LP, 351 F.3d 663, 667 (5th Cir. 2001)(citing Mijalis 15 F.3d at 1318; Bender v. Brumley, 1 F.3d 271, 276-77 (5th Cir. 1993)).

[7] Mijalis, 15 F.3d at 1318 (quoting Bender, 1 F.3d at 276-277).

[8] Id.; Taita Chem., 351 F.3d at 667 (citing Bank One, Texas, N.A. v. Taylor, 970 F.2d 16, 30 (5th Cir. 1992)).

[9] Taita Chem., 351 F.3d at 667.

*Federal Deposit Ins. Corp. v. Wheat*, 970 F.2d 124, 130 (5th Cir. 1992).

In this diversity case the district court and this court must apply the substantive insurance law of Texas. *Erie v. Tompkins*, 304 U.S. 64, 78-79 (1938); *Am. Nat'l Gen. Ins. Co. v. Ryan*, 274 F.3d 319, 328 (5th Cir. 2001). Texas courts interpret insurance policies according to the rules of contractual construction. *Kelley-Coppeledge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998). In applying these rules, a court's primary concern is to ascertain the parties' intent as expressed in the language of the policy. *Id.* Thus, the district court was required to give effect to all contractual provisions so that none will be rendered meaningless. *Id.* The undefined terms in an insurance policy are to be given their ordinary and generally accepted meaning unless the policy shows that the words were meant in a technical or different sense. *Sport Supply Group Inc. v. Columbia Cas. Co.*, 335 F.3d 453, 461 (5th Cir. 2003). If the contract is worded so that it can be given a definite meaning, it is unambiguous and a judge must construe it as a matter of law. *Id.* When a contract is reasonably susceptible of more than one meaning, however, it is ambiguous and a court should adopt a construction that favors the insured. *Id.* at 461; *Nat'l Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991). Specifically, when a word or clause has more than one meaning, the meaning favoring the insured must be applied. *TIG Specialty Ins. Co. v. Pinkmonkey.com Inc.*, 375 F.3d 365, 369-70 (5th Cir. 2004). Whether an insurance contract is ambiguous is a

16

question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered.  Kelley-Coppeledge, 980 S.W.2d at 464.

In applying the foregoing Texas rules, we reach substantially the same results as did the district court.  Standing alone, the term "claim" is susceptible of more than one meaning.[10]  Lawyers commonly use "claim" as a noun in at least three different senses: (1) The aggregate of operative facts giving rise to a right enforceable by a court; (2) The assertion of an existing right, such as a right to payment or to an equitable remedy; (3) A demand for money, property, or a legal remedy.[11]  Lay persons also use "claim" as a noun having more than one meaning: (1) A demand for something due or believed to be due; (2) A right to something, such as a title to a debt, privilege or thing in the possession of another; (3) An assertion open to challenge.[12]  The EIL policy does not expressly or by implication specify which meaning is intended.  Consequently, the policy itself is also susceptible of more than one interpretation.

Accordingly, we construe the ambiguous noun "claim" using its ordinary meaning that is most favorable to the insured in this case, that is, as the "assertion of a right" to hold the insured liable.

---

[10] "The word 'claim,' to adapt a felicitous phrase of Justice Frankfurter, is one of those 'words of many-hued meanings [which] derive their scope from the use to which they are put.'"  MGIC Indem. Corp. v. Home State Sav. Ass'n, 797 F.2d 285, 288 (6th Cir. 1986) (quoting Powell v. U.S. Cartridge Co., 339 U.S. 497, 529 (1950) (Frankfurter, J. dissenting)).

[11] See BLACK'S LAW DICTIONARY 264 (8th ed. 2004).

[12] See MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 210 (10th ed. 1998).

This is essentially the meaning that the district court adopted when it defined "claim" in the jury charge as "an assertion by a third party, that in the opinion of the third party, the insured is liable to it for damages within the risks covered by the policy[.]"

The Second Circuit Court of Appeals and a highly respected insurance law treatise have adopted similar definitions in construing the undefined term "claim" in claims-made policies insuring against environmental liability. See American Insurance Co. v. Fairchild Industries, Inc., 56 F.3d 435, 439 (2d Cir. 1995)("Giving the term its ordinary meaning, a claim is an assertion by a third party that in the opinion of that party the insured may be liable to it for damages within the risks covered by the policy.")(emphasis added); Andy Warhol Foundation for Visual Arts, Inc. v. Federal Ins. Co., 189 F.3d 208, 215 (2d Cir. 1999); See COUCH ON INSURANCE § 191.10 (3d ed. 2000):

> [A] "claim" is an assertion by a third party that, in the opinion of that party, the insured may be liable to it for damages within the risk covered by a policy, whether or not there is reason to believe that there actually is liability. Further, a claim may be made without institution of formal proceeding. Virtually any assertion of exposure to liability within the risk covered by an insurance policy is a claim, unless the assertion is made in circumstances so unusual that they negate possibility of formal proceeding involving defense costs as well as liability.

(footnotes omitted; emphasis added)(citing Fairchild, 56 F.3d at 435).

International contends that the district court's jury instruction was legally erroneous because it did not require the jury to find that the EPA had made a demand of any kind on RSR. In

18

order to show that this is the conclusion that the district court should have reached, however, International must demonstrate, at a minimum, that the district court's jury charge did not properly guide the jury according to the controlling law of Texas. Having failed to consider or discuss the jury instruction at issue in relation to Texas law, International is not in a position to demonstrate error in either the district court's contractual interpretation or the jury instruction derived therefrom. Consequently, International has fallen far short of showing that there is a substantial and ineradicable doubt whether the jury had been properly guided in its deliberations.

International's whole argument is a misdirected attempt to show that the definition of "claim" in the jury instruction is inconsistent with the decisions of courts applying the law of states other than Texas to factual situations and insurance policy provisions markedly different from those at issue in the present case. In fact, after examining those cases carefully and noting their distinguishing features, we conclude that they are consistent with the district court's decision here and contradict, rather than support, International's argument.

International relies first on a decision by the Iowa Supreme Court, Dico, Inc. v. Employers Insurance of Wausau, 581 N.W. 2d 607 (Iowa 1998), applying Iowa law to interpret the undefined term "claim" in a Commercial General Liability ("CGL")occurrence policy. The case is distinguishable from our case for many reasons. The case was not governed by Texas law. The policy involved was not a

claims-made policy.  The question was not whether a claim had been made under a claims-made policy. The question was whether the insured properly notified the insurer  of a claim by a third party under an occurrence policy.

More significantly, although the Iowa court adopted in that case the narrowest definition of "claim," i.e., as a demand, from a dictionary without expressly consulting state law, that definition was the one most favorable to Dico, the insured.  The court tacitly recognized that "claim" was ambiguous in rejecting the insurer's "broad reading of the term" without giving any other reason.  Id. at 613.  Thus, besides being distinguishable on many grounds, Dico does not conflict with our decision here.  In the final analysis, it is simply another case in which the court construed the ambiguous term "claim" to have the meaning most favorable to the insured in that particular case.  Thus, International's reliance on Dico is misplaced.

International also misplaces its reliance on our cases deciding whether the Federal Deposit Insurance Corporation's ("FDIC") communications to regulated banks and bankers under Louisiana law amounted to "claims" triggering coverage under claims-made Directors and Officers Liability insurance policies ("D&O policies").  See Federal Deposit Ins. Corp. v. Booth, 82 F.3d 670, 675-76 (5th Cir. 1996); Mijalis, 15 F.3d at 1314; Federal Deposit Ins. Corp. v. Barham, 995 F.2d 600, 604 (5th Cir. 1993).  Those decisions are not controlling or directly applicable because they are based on Louisiana, not Texas, law and deal with different species of claims-

20

made insurance policies,[13] policy provisions and types of factual patterns.[14]

Nonetheless, <u>Mijalis</u>, <u>Barham</u> and <u>Booth</u> are not inconsistent with the district court's definition of "claim" in its jury instruction in our case. A careful examination of the reasoning in those cases reveals that the court did not mechanically apply a simplistic one-word definition of "claim" or "demand" in deciding whether a claim had been made in each case. Instead, the court engaged in a detailed examination of each case, including the facts, policy provisions, relationship of the parties, and the specific nature and timing of the FDIC's communication to the bank and bankers. The district court in the present case acknowledged its awareness of this court's analytical process in <u>Mijalis</u>, et al., and took that into account, along with the Texas law governing insurance contractual interpretation, in preparing its jury instructions.

In reviewing our decisions in those FDIC cases, we discovered several insights into this court's evaluation of the FDIC's actions

---

[13] That is, D&O policies as opposed to the EIL policy at issue here.

[14] The D&O policy cases present a situation of much greater complexity than we confront in the present case, which helps explain why communication between the FDIC and the officers and directors of a bank would not necessarily constitute a "claim."
In the FDIC cases, the FDIC plays two roles, first as a regulator that communicates frequently with the regulated banks, directors and officers, and second, as the receiver and enforcer of the bank's right to hold the former directors and officers liable for losses caused by their breach of fiduciary duties. Thus, the FDIC may issue regulatory communications to the bank and its officers and directors for some time after a loss or liability actually has occurred without knowledge of the loss. Hence, it may be ambiguous whether any given communication refers to a loss constituting a claim.

and communications in respect to whether they constituted claims under the claims-made D & O policies. First, a "claim" or "demand" does not have to be explicit but may be inferred from the acts and communications of the third party; the more difficult cases will turn on whether those elements add up to an implied claim or demand.[15] Second, the dictionary definitions of "claim" or "demand" usually are too indeterminate to serve as the actual tools for deciding whether an implied claim or demand was made. In each case the court was required to go beyond those definitions and to undertake an intensive, detailed examination of the specific facts, the meaning and purpose of the particular insurance policy provisions, the relationships between the parties, the applicable law defining the rights and obligations of the actors, and any other relevant factor. Finally, the court in the FDIC-D&O cases, after weighing these factors, determined whether a claim was made by asking whether the act or communication at issue referred with

---

[15] Thus, as we observed in Mijalis, "whether a given demand is a 'claim' within the meaning of a claims-made policy requires a fact-specific analysis ... conducted on a case-by-case basis. Other [than lawsuits,] communications to the insured may or may not rise to the level of claims depending on their content." 15 F.3d at 1331 (citing MGIC Indem. Corp. v. Central Bank, 838 F.2d 1382, 1388 (5th Cir. 1988) ("[T]he given set of facts will determine on a case-by-case basis when a 'claim' is 'made' for the purposes of a given D&O policy[.]")).

As Mijalis and MGIC suggest, close inspection of the D&O cases shows that a "claim," as well as a "demand," may be implicit or explicit. In fact, while some communications are clearly "claims" on their faces, such as lawsuits or fully expressed requests for recompense, in Barham, Mijalis and Booth the court undertook an intensive analysis of the specific facts with respect to how they related to important features of the particular insurance policy and legal rule at issue in order to classify each communication as an implied "claim" or "demand," or as just an "act" or "communication."

sufficient definiteness to a covered loss, i.e. a liability arising from the directors' and officers' conduct specified by the policy, that had accrued or was sufficiently imminent, and upon which the FDIC, as receiver of the bank, had a legal right to obtain judgment against the insureds based on that liability at the time of the FDIC's act or communication.[16]

---

[16] For example, in Barham, the court's most cogent reasons for deciding that a bank's letter agreement with the OCC was not a "claim" were: "[T]he 1982 letter makes no reference to a loss which [the bank] may sustain as a result of its failure to comply with certain banking regulations[.]"  995 F.2d at 605.  Later in Mijalis, the court quoted that Barham passage and held that "the cease and desist order, the notice of charges, and the other demands for corrective action" did not rise to the level of a claim.  The Mijalis court explained that:

> The term "claim" is intimately connected with the term "loss" in the insuring clause, and it appears as part of the definition of "loss" as well....  It is clear that the policy envisions "claims" as being closely related to legal obligations to pay money[.]  ... [The FDIC communications to the bank] are the same sort of general demands for regulatory compliance as the one before the Barham court.  None of these documents clearly refers to an insured loss that the Bank would or might sustain if it did not abide by the FDIC's mandates.  Even specific formal demands for corrective action do not rise to the level of "claims" unless coupled with indications that demands for payment will be made.

Id. at 1332-33. (citing Barham, 995 F.2d at 604).  In Booth, the FDIC's letter to bank directors warned that "failure to take corrective action ... could result in civil money penalties being recommended and/or more severe enforcement actions being recommended to the FDIC [board.]"  82 F.3d at 675.  After discussing the court's use of the process in the previous cases, the court concluded "that a letter suggesting that, in the future, charges may be filed against the Directors, if they do not comply with regulations, is too tenuous to constitute a claim.  We conclude that the FDIC correspondence does not rise to the level of a claim against the Directors." Id. at 677.  Thus, the court used the same process to determine that the communications did not refer to a loss that the bank may sustain because that possible future loss was too tenuous.

Consequently, we conclude that the district court's approach in preparing the jury instructions here was consistent with the fact-specific, case by case analysis used by this court to determine whether the FDIC actions and communications at issue in Mijalis, Barham and Booth were "claims" under the D & O policies. Thus, those FDIC-D&O cases tend to corroborate, rather than point to any material deficiency in, the district court's analysis and efforts to make the jury instructions relevant to the particular case at hand.

For these reasons, we find that beyond any substantial doubt the jury in this case was properly guided in its deliberations. Because International did not show that the jury instruction was wrong under Texas law and because the authorities that International relies upon in challenging the jury instruction are inapposite, we find no error in the district court's instruction to the jury, much less error that would leave "substantial and ineradicable doubt" as to whether the jury was properly instructed. Because we find no error in the district court's instruction, it is not necessary that we address RSR's contention that International is estopped from making this challenge because it accepted the instruction.

2. The Supplemental Jury Charge Did Not Involve a Risk of Misleading or Confusing the Jury So Great as to Constitute Reversible Error.

Second, International challenges the district court's additional jury instruction on the definition of a "claim" that followed Question No. 1 of the Court's charge and stated:

24

In ascertaining the answer to this question, you are instructed to consider all the facts and circumstances surrounding the EIL policy, as well as the conduct of the parties. I have defined "claim" for you above in the definitions section of this Charge. I further instruct you that the meaning of "claim" derives its scope from the use to which it is put by the parties involved in this case. In other words, the meaning of "claim" must be considered in the context of the EIL Policy itself and as applied in the context of this environmental litigation. Evidence that the parties (or their predecessors) and/or the EPA considered there to be a claim, while by no means determinative, is probative of the definition of claim contemplated by the parties.

International objects to the supplemental jury instruction on the grounds that it was misleading to the jury. We do not agree. The evidence presented to the jury on this issue tended to show both the circumstances surrounding the contract and how the parties interpreted or treated it in respect to whether a claim had been made. The supplemental instruction properly guided the jury in the appropriate use of the evidence for those purposes.

Under Texas law, because the parties themselves are in the best position to know what was intended by the language used by them, the construction placed on an ambiguous contract by the parties will govern the court's interpretation of the agreement. Kelly v. Rio Grande Computerland Group, 128 S.W.3d 759, 768 (Tex. 2004); James Stewart & Co. v. Law, 233 S.W.2d 558, 561 (Tex. 1950); Droemer v. Transit Mix Concrete of Gonzales, Inc., 457 S.W.2d 332, 335 (Tex. Civ. App. 1970); Danaho Refining Co. v. Dietz, 398 S.W.2d 307, 311 (Tex. Civ. App. 1966); Anchor Cas. Co. v. Robertson Transport Co., 389 S.W.2d 135, 139 (Tex. Civ. App. 1965); RESTATEMENT (SECOND) OF CONTRACTS § 202, cmt. g (1981)("The parties to an agreement know best what they mean, and their action under it is often the strongest

25

evidence of their meaning."). Thus, the evidence of the course of dealing and performance of the contract was admissible and properly could be considered by the jury as an indication of the construction that the parties themselves put on the crucial term "claim." Kelly, 128 S.W.3d at 768; James Stewart, 233 S.W.2d at 561; Droemer, 457 S.W.2d at 335; Danaho Refining, 398 S.W.2d at 311; Anchor Cas., 389 S.W.2d at 139.

Further, under Texas law, the insured was entitled to have the jury take into consideration the surrounding circumstances in determining the crucial factual issue of whether the EPA, in effect, asserted that RSR was liable to it for damages within the risks covered by the policy when it placed the Harbor Island site including RSR's lead smelting facility on the National Priorities List. See Nat'l Union Fire, 907 S.W.2d at 521 (explaining that "[e]xtrinsic evidence may, indeed, be admissible to give the words of a contract meaning consistent with that to which they are reasonably susceptible, i.e. to 'interpret' contractual terms"); Mijalis, 15 F.3d at 1331 (explaining that to decide whether a communication is a "claim" "requires a fact-specific analysis conducted on a case-by-case basis"). Furthermore, when a term in a contract has more than one reasonable interpretation, as the term "claim" does here, a court may examine extrinsic evidence to determine the parties' intended meaning, such as the parties' interpretation of the contract. Kelly, 128 S.W.3d at 768.

International has not demonstrated that the charge as a whole creates "substantial and ineradicable doubt whether the jury has

26

been properly guided in its deliberations." Mijalis, 15 F.3d at 1318. Moreover, even if the jury instruction was erroneous, we would not reverse because we determine, based upon the entire record, that the challenged instruction could not have affected the outcome of the case. Id.

3. The Jury's Verdict Was Supported by Legally Sufficient Evidence.

International argues alternatively that, if we find no error in the district court's jury charges, the judgment still should be reversed because the record contains no legally sufficient evidence to support the jury's verdict that the EPA made a claim upon RSR during the policy period. Specifically, International contends that the evidence is not sufficient to support a reasonable jury's finding that the EPA asserted that, in its opinion, RSR was liable to the EPA for CERCLA damages due to lead pollution at Harbor Island.

We review de novo the district court's denial of a motion for judgment as a matter of law, applying the same standard as the district court.[17] But when a case is tried by a jury, a Rule 50(a) motion is a challenge to the legal sufficiency of the evidence.[18] In resolving such challenges, we draw all reasonable inferences and resolve all credibility determinations in the light most favorable

---

[17] Cozzo v. Tangipahoa Parish Council-President Gov't, 279 F.3d 273, 280 (5th Cir. 2002).

[18] Brown v. Bryan County, 219 F.3d 450, 456 (5th Cir. 2000).

27

to the nonmoving party.[19]  Thus, we will reverse the denial of a Rule 50(a) motion only if the evidence points so strongly and so overwhelmingly in favor of the nonmoving party that no reasonable juror could return a contrary verdict.[20]  A jury verdict must be upheld unless "there is no legally sufficient evidentiary basis for a reasonable jury to find" as the jury did.  FED. R. CIV. P. 50(a)(1);  Hiltgen v. Sumrall, 47 F.3d 695, 700 (5th Cir. 1995).

This court has consistently applied this standard to show appropriate deference for the jury's determination.  As we have explained:

> A jury may draw reasonable inferences from the evidence, and those inferences may constitute sufficient proof to support a verdict.  On appeal we are bound to view the evidence and all reasonable inferences in the light most favorable to the jury's determination.  Even though we might have reached a different conclusion if we had been the trier of fact, we are not free to re-weigh the evidence or to re-evaluate credibility of witnesses. We must not substitute for the jury's reasonable factual inferences other inferences that we may regard as more reasonable.

Id. (citing Rideau v. Parkem Indus. Serv.s, Inc., 917 F.2d 892, 897 (5th Cir. 1990)).

In this case, the district court, in denying International's motion for judgment as a matter of law, explained:

> [T]he jury heard evidence from various witnesses about the significance of a pollution site being placed on the National Priority List by the Environmental Protection Agency and what such a listing meant for RSR.  The significance of such action by the EPA cannot be

---

[19] Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 150 (2000).

[20] Cousin v. Trans Union Corp., 246 F.3d 359, 366 (5th Cir. 2001).

28

separated from the fact that the policies at issue were intended for environmental impairment liability protection, and thus is the context in which the policies are to be understood.

Considering the record in this case, we agree with the district court and conclude that the jury's verdict is supported by legally sufficient evidence, which included the undisputed fact that the RSR smeltery caused substantial lead pollution on Harbor Island and near Seattle, the EPA's placement of the insured's lead smeltery on the National Priorities List, the undisputed liability of the insured to the EPA for environmental impairment under CERCLA, the virtual certainty of further investigative and enforcement actions by the EPA, and the actions and communications indicating that the counsel and other representatives of both parties had concluded that a timely claim had been made under the policy.

Indeed, the EPA's Final NPL, which included the "Harbor Island Lead" site among other sites selected because of their "known releases or threatened releases of hazardous substances, pollutants and contaminants," expressly stated that: "The Agency will decide on a site-by-site basis whether to take enforcement action or proceed directly with Fund-financed response actions and seek recovery of response costs after cleanup." 48 Fed. Reg. 40658-40673 (emphasis added).

It is frequently observed that even though placement of a site on the NPL is simply the first step in a process,[21] it guarantees more detailed study and drastically increases the likelihood of

_____

[21] Eagle-Picher Industries v. EPA, 759 F.2d 922, 932 (D.C. Cir 1985).

costly enforcement action.[22] Moreover, placement on the NPL has immediate significant adverse consequences for the owner of a listed property.[23] The regulations provide for a removal of a site from the NPL, "where no further response is appropriate."[24] Before a delisting can occur, the EPA must consult and obtain the state's approval, publish a list of intent to delist in the Federal Register and a major local newspaper, and allow public comment for at least 30 days.[25]

In addition, the jury reasonably could have concluded that according to the parties action and mutual construction of their contract a timely claim had been made, triggering coverage under the policy. At trial, John Walter Morrison, counsel employed by North River to evaluate coverage issues under the policies, testified that

---

[22] Carus Chemical Company v. EPA, 395 F.3d 434, 437 (D.C. Cir. 2005); see Mead Corp. V. Browner, 100 F.3d 152, 155 (D.C. Cir 1996); DANIEL RIESEL, ENVIRONMENTAL ENFORCEMENT: CIVIL AND CRIMINAL, § 12.02[1](2005)(citing Eagle-Picher, 759 F.2d at 920).

[23] Carus, 395 F.3d at 437 (citing Mead Corp. v. Browner, 100 F. 3d 152, 155 (D.C. Cir 1996)(costs in business reputation, property value and increased probability of remediation); RIESEL, at § 12.02[1] (citing SCA Services of Indiana v. Thomas, 634 F. Supp. 1355, 1361-66 (N.D. Ind. 1986)(recognizing the damage to business reputation and loss of value in property that results from listing on the NPL); B&B Tritech, Inc. v. EPA, 957 F.2d 882, 883 (D.C. Cir. 1992)(placement on the NPL has "considerable costs"); see Mead Corp. v. Browner, 100 F.3d 152, 155 (D.C. Cir 1996)("This circuit has clearly recognized the harmful effects of being linked to a site placed on the NPL. Bd. of Regents of Univ. of Wash. v. EPA, 86 F.3d 1214, 1217 (D.C.Cir.1996)); see also Kent County, Delaware Levy Court v. EPA, 963 F.2d 391, 394 (D.C. Cir. 1992) (damage to business reputation, loss of property value and other considerable costs).

[24] REISEL, ENVIRONMENTAL ENFORCEMENT, at § 12.02[2][d](citing CFR § 300.425(e)).

[25] Id.

when the EPA placed Harbor Island on the NPL the insurer and the insured considered that it was a virtual certainty that the government would either require RSR to conduct cleanup operations or make reimbursement for an EPA-financed cleanup. He further testified that he told RSR that North River treated the EPA's site listing of Harbor Island as a claim and that he was not misrepresenting his client's position when he did so. He stated that: "We viewed it as a claim against the insured, RSR, and that RSR in turn had made claim under the policy for the claim made against it." Clarice Davis, RSR's retained counsel at that time, testified that she heard Mr. Morrison say that North River acknowledged that a claim had been made, and that "we discussed all of those matters as claims that we had noticed under that policy." John De Paul, an RSR officer, testified that when Mr. Morrison and Mr. Melton, another North River representative, talked to him and others at RSR "they talked about it being a claim.... Every one referred to it as a claim." Jack Wachtendorf, then RSR's insurance broker, testified that he "absolutely" took the proposed NPL listing to be a claim made under the policy and that North River never said that they did not consider it to be a claim. RSR's Vice President for Environmental Affairs, Gerald Dumas, testified that when a company is placed on the Superfund list, it means the EPA intends to take some action against the company for some type of environmental damage. When asked whether the EPA always follows through and takes action if a company is listed, he responded, "Well, I can—in relating to cases that we've been involved with,

31

I would say yes."

Given the breadth of coverage provisions of the EIL policy, the absence of any contractual definition of "claim," the legal rules regarding the construction of insurance policies in favor of the insured, and the gravity of the EPA's assertions regarding RSR's Harbor Island lead facilities (and the potentially enormous monetary exposure associated therewith), RSR presented sufficient evidence to the jury of an assertion of the government's right to hold RSR strictly liable under CERCLA for damages and environmental impairment.

4. <u>The District Court Did Not Abuse Its Discretion When It Held that John Morrison's Testimony Was Not Protected by the Attorney-Client Privilege.</u>

International argues that the district court abused its discretion in allowing Mr. John Walter Morrison, former counsel of North River, to testify that during the policy period he on behalf of North River communicated to RSR that the insurance company considered the EPA placement of the Harbor Island site on the Superfund List as a claim against RSR under the EIL policy.

International contends that the district court abused its discretion when it overruled International's objection to the admission of Mr. Morrison's testimony as a violation of International's attorney-client privilege. We do not agree. The attorney-client privilege protects from disclosure confidential communications between a client and his or her attorney "made for the purpose of facilitating the rendition of professional legal

32

services to the client...." <u>Huie v. DeShazo</u>, 922 S.W.2d 923 (Tex. 1986)(quoting TEX. R. CIV. EVID. 503(b))."[26] Mr. Morrison's testimony did not disclose any "confidential communications" between North River and him as its attorney. His testimony described the communications between himself and the attorneys and agents of RSR and his independent inference and conclusion based upon them, viz., that he as North River's representative and his counterparts representing RSR treated the NPL's inclusion of the Harbor Island site as a claim by EPA against RSR.[27]

5. <u>The District Court Did Not Abuse Its Discretion When It Did Not Allow International to Present to the Jury Excerpts from Donal Brayer's Deposition.</u>

International argues that the district court abused its discretion by refusing to allow International to introduce an excerpt of the deposition of Donald Brayer, an insurance expert retained by RSR whom neither RSR nor International had designated to be called as a witness at trial. Consequently, Mr. Brayer was

---

[26] We review the district court's ruling on the admissibility of evidence for an abuse of discretion. <u>United States v. Wilson</u>, 322 F.3d 353, 359 (5th Cir. 2003). The availability of a privilege in a diversity case is governed by the law of the forum state. FED. R. EVID. 501; <u>Miller v. Transamerica Press</u>, 621 F.2d 721, 724 (5th Cir. 1980).

[27] A communication is only "confidential" for the purposes of the attorney-client privilege if it is not intended to be disclosed to a third party. TEX. R. EVID. 503(a)(5). Insofar as the record discloses the communications and treatment of the claim between RSR and North River to which Mr. Morrison testified was within the intention of North River. North River had an opportunity at trial to introduce further evidence controverting Mr. Morrison's testimony and his authority to act for it in treating the NPL inclusion as a claim. But North River claimed that evidence was privileged also and opted not to introduce it.

not present or immediately available. Before offering the deposition excerpt, International had not intended to call him as a witness. In the excerpt, Mr. Brayer had testified to his definition of a claim under an insurance policy. RSR objected to the introduction of the deposition excerpt on grounds of unfair prejudice because it had not arranged for Mr. Brayer to be present, relying on International's expressed intention not to call him.

The district court has broad discretion in assessing admissibility under the rule providing for exclusion of relevant evidence if its probative value is substantially outweighed by danger of unfair prejudice, confusion of issues or misleading jury. United States v. Morris, 79 F.3d 409 (5th Cir. 1996). The trial judge's assessment of relative probative value of evidence and unfair prejudice is generally accorded great deference because of his or her first-hand exposure to evidence and familiarity with the course of the trial proceedings. United States v. Briscoe, 896 F.2d 1476 (7th Cir. 1990). Given the circumstances, the district court did not abuse its discretion in finding that the danger of unfair prejudice to the opposing party outweighed the probative value of the evidence and concluding that the excerpt should be excluded. See Geiserman v. McDonald, 893 F.2d 787, 791 (5th Cir. 1990).

6. The District Court Did Not Abuse Its Discretion When It Denied International's Motion for a New Trial.

Finally, International urges that it is entitled to reversal of the judgment because the jury's finding that RSR had not waived

34

its right to coverage under the EIL policy was against the great weight of the evidence and shows a seriously erroneous result.

Under Texas law, a waiver occurs when a party intentionally relinquishes a known right or intentionally engages in conduct that is inconsistent with claiming a known right. Emscor Mfg., Inc. v. Alliance, Ins. Group, 879 S.W.2d 894, 917 (Tex. App. - Houston [14th Dist.]). The words or the conduct of the parties must "unequivocally manifest" the parties' intent to no longer assert the right. Enterprise Laredo Assoc. v. Hachar's Inc., 839 S.W.2d 822, 835 (Tex. App - San Antonio 1992, writ denied).

International argues that RSR's prior conduct is inconsistent with its current assertion of a right to coverage under the EIL policies for the Harbor Island claim because Howard Myers, RSR's General Counsel, in letters to North River in 1995, indicated that it did not intend to make a claim regarding the Harbor Island site.

Mr. Myers testified, however, that at the time he had hopes that RSR would be indemnified by Bergsoe/East Asiatic, making it unnecessary for RSR to call upon International for indemnification under the policy. He explained that he did not intend to waive any of RSR's rights but simply expressed his expectation that an insurance claim would not be necessary.

We review a district court's ruling on a motion for new trial for abuse of discretion. Dawson v. Wal-Mart Stores, Inc., 978 F.2d 205, 208 (5th Cir. 1992) (citing Munn v. Algee, 924 F.2d 568, 577 (5th Cir. ), cert. denied, 502 U.S. 900, (1991); Conway v. Chemical Leaman Tank Lines, Inc., 610 F.2d 360, 362 (5th Cir. 1980) (citing

35

Spurlin v. General Motors Corp., 528 F.2d 612 (5th Cir. 1976)). As a reviewing court we give great deference to the district court ruling when it has denied the new trial motion and upheld the jury's verdict. Dawson, 978 F.2d at 208; Munn, 924 F.2d at 577; Jones v. Wal-Mart Stores, Inc., 870 F.2d 982, 986 (5th Cir. 1989); Conway, 610 F.2d at 362 (citing Valley View Cattle Co. v. Iowa Beef Processors, 548 F.2d 1219 (5th Cir.), cert. denied, 434 U.S. 855 (1977)). "New trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great weight of the evidence." Conway, 610 F.2d at 363.

Based on the conflicting evidence, the district court found that a reasonable jury could have found that RSR did not permanently and unequivocally waive its right to recover from International. Accordingly, the district court denied International's motion for a new trial. Applying the applicable deferential standard, we cannot say that the district court abused its discretion, and we therefore affirm its ruling. Based on the evidence, a reasonable jury could have found that RSR did not permanently and unequivocally waive its right to recover from International.


CONCLUSION

For these reasons, the judgment of the district court is AFFIRMED.

36